AO 91 (Rev. 11/11)  Criminal Complaint



# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

FILED

MAR 1 3 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Sammy Sultan | ) | Case No. |
| | ) | |
| | ) | 4 - 17 - 70336 |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

MAG

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___February 2015 to August 2016___ in the county of ___Alameda___ in the

___Northern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875 and 47 U.S.C. § 223 | Violations of Interstate Communications and Obscene or Harassing Calls |

PENALTIES:
18 U.S.C. § 875: 5 years imprisonment, 3 years supervised release, $250,000 fine,
$100 special assessment, restitution and forfeiture, if applicable.
47 U.S.C. § 223: 2 years imprisonment, 1 year supervised release, $250,000 fine,
$100 special assessment, restitution and forfeiture, if applicable.

This criminal complaint is based on these facts:

See attached affidavit of Mark Dixon, FBI Special Agent.

☑ Continued on the attached sheet.

Approved as to form

_Elai Dur_

AUSA ELISE BECKER

_Complainant's signature_

Mark Dixon, FBI Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  3/13/17

_Judge's signature_

City and state:          Oakland, California

KANDIS A. WESTMORE, U.S. Magistrate Judge
_Printed name and title_

Document No.

District Court
Criminal Case Processing

## AFFIDAVIT OF FBI SPECIAL AGENT MARK R DIXON

## INTRODUCTION & PURPOSE FOR THE CRIMINAL COMPLAINT

I, Mark R Dixon, being duly sworn, depose and state as follows:

I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately 11 years. I am currently assigned to the Oakland Resident Agency within the San Francisco Division where my primary duties involve the investigation of a wide variety of federal criminal offenses. I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

During my employment with the FBI, I have conducted, and otherwise participated in, hundreds investigations of violations of federal law involving drug and weapons-related crimes; white collar crime offenses; terrorism offenses; and complex internet-based frauds. In the course of my work, I have gained experience in the use of various investigative tools and techniques involving the implementation of wiretaps, use of physical surveillance and undercover operations, execution of search warrants, debriefings of informants and witnesses, use of Global Positioning System (GPS) enabled tracking devices and analysis of telephone toll records, cellular telephone location information and pen register and trap and trace data.

I am a graduate of the FBI Academy in Quantico, Virginia. As part of my training to become a Special Agent, I received hundreds of hours of training in physical surveillance, legal statutes and procedures, criminal and national security investigations, interviewing and interrogation, financial investigations, confidential source management, and electronic surveillance techniques.

Since graduating from the FBI Academy, I have received additional training, including specialized training related to cellular telephones and cellular telephone technology. In 2009, I completed a one week course entitled "Cellular Survey Analysis and Geo-location" sponsored the FBI. This course was designed to provide instruction relating to cellular telephone record analysis, cellular telephone location data and mapping and cellular telephone tracking.

I have personally participated in the execution of dozens of search warrants and arrest warrants involving a wide variety of local, state and federal criminal violations. I have been an affiant on numerous affidavits, including criminal complaints and search warrants for residences, vehicles and cellular telephones. As a result of my training and experience, I have become familiar with the manner in which criminals use cellular telephones, cellular telephone technology, false and fictitious identities, and other means to facilitate their illegal activities and to thwart law enforcement investigations.

I am submitting this affidavit in support of a criminal complaint and arrest warrant charging SAMMY SULTAN with violations of 18 U.S.C. § 875 (Interstate Communications) and 47 U.S.C. § 223 (Obscene or Harassing Calls).

This affidavit sets forth the facts and evidence that are relevant to the requested criminal complaint, but does not set forth all of the facts and evidence that I have gathered during the course of the investigation of this matter.

1

The statements contained in this affidavit are based upon my own investigation, observation, training and experience, upon records supplied by various cellular telephone companies and information, documents, records, audio recordings and reports supplied to me by various agents, troopers, detectives and police officers from various federal, state and municipal law enforcement agencies in the United States and Canada.

## RELEVANT STATUTES

This investigation concerns alleged violations of 18 U.S.C. § 875 (Interstate Communications) and 47 U.S.C. § 223 (Obscene or Harassing Calls) (the "TARGET Offenses")

18 U.S.C. § 875 prohibits the transmission in interstate or foreign commerce any communications containing any threat to kidnap any person or any threat to injure the person of another;

47 U.S.C. § 223 prohibits making a telephone call or utilizing a telecommunications device, whether or not conversation or communications ensues, without disclosing his identity and with intent to abuse, threaten, or harass any specific person.

## DISCUSSION OF EVIDENCE AND PROBABLE CAUSE

From in or about February of 2015 through August 25, 2016, the FBI has been conducting an investigation of an originally unidentified individual, later identified as SAMMY SULTAN (hereinafter, "SULTAN"), who is believed to be responsible for placing hundreds of obscene, annoying, threatening, harassing and/or sexually explicit telephone calls to representatives from various law enforcement agencies in the United States and Canada. He is also suspected of placing obscene and sexually explicit telephone calls to, and leaving sexually explicit voice messages for, at least one private citizen residing in the United States.

As further described below, the phone calls have caused substantial stress and anxiety on the law enforcement officers in receipt of the phone calls. The calls have also caused law enforcement agencies to expend resources receiving and responding to the hoax calls, including in some instances deploying hostage negotiators and tactical police squads to respond to the false threats.

### Initial Calls to the Massachusetts State Police (MSP) and Elsewhere in the U.S.

The investigation of SULTAN was initiated when authorities from the MSP contacted the FBI to report a series of harassing and threatening telephone calls received at their South Yarmouth Barracks on Saturday, February 7, 2015.

On that date, SULTAN called the South Yarmouth Barracks of the MSP and asked to speak with a female officer or sergeant. During the initial call and a series of subsequent calls he placed to the barracks that day, SULTAN told the Sergeant with whom he subsequently spoke that he was staying at a nearby hotel. Among other things, he alleged that he had spent time in a mental institution at some point, took medication for his head, that he possessed several guns, rifles and/or handguns and had hurt several people. He offered to meet with the Sergeant and surrender his guns if the Sergeant would answer his questions.

SULTAN provided the Sergeant with several different names and a call back number which subsequently was determined to be a non-working number. According to the Sergeant who spoke with him, SULTAN's voice sounded like a male and he spoke with a stuttered accent. He refused to provide any biographical information and attempted to engage the Sergeant in a conversation concerning a series of bizarre topics, at one point requesting to "sniff" her slippers. After spending an extended period on the telephone with SULTAN, the Sergeant eventually refused to remain on the telephone with SULTAN and answer his questions without knowing his identity. Thereafter, SULTAN threatened to come to the Sergeant's home, the location of which he claimed to know, sneak into her residence and kill her at a time of his choosing.

Troopers from the MSP made immediate attempt to trace the calls placed by SULTAN to the barracks that evening. Through contact with representatives from the telephone company which provides service to the barracks, troopers from the MSP learned that SULTAN placed the aforementioned threatening calls using a prepaid MetroPCS cellular telephone assigned the number, (908) 986-4932 ("SULTAN phone #1").

Investigators also conducted extensive toll analysis on records supplied by MetroPCS/T-Mobile for SULTAN phone #1. The analysis revealed that, in addition to the calls placed to the South Yarmouth Barracks on February 7, 2015, SULTAN phone #1 was used to place more than 40 additional outgoing calls to various other police departments located throughout the United States from the period from February 6, 2015 through February 8, 2015. The records further revealed that, in total, during the time period from February 3, 2015 through March 1, 2015, SULTAN phone #1 was used to place more than 200 outgoing calls to various police departments located in New Jersey, Massachusetts, Ohio, North Dakota, South Dakota, Kentucky, Wyoming, California, Arizona, Texas, Washington D.C., Nevada, Wisconsin, Florida, Missouri, Indiana, Georgia and Missouri.

After learning of the calls placed over SULTAN phone #1 to the various police departments throughout the United States, investigators contacted representatives from several of those agencies to inquire of the circumstances surrounding the calls and to obtain recordings of the calls. As a result of those contacts, investigators obtained recordings of calls placed to the Brockton, Rehoboth and Shrewsbury, Massachusetts Police Departments on February 7 and February 11, 2015. In total, these calls alone lasted for almost 3 hours.

For several reasons, I believe that SULTAN, the individual who used SULTAN phone #1 to call the South Yarmouth Barracks of the MSP on February 7, 2015 and threatened to kill the Sergeant, is the same person who called the Brockton, Rehoboth and Shrewsbury Police Departments on February 7 and February 11, 2015. For one, cellular tower location information relating to the calls placed to the Brockton, Rehoboth and Shrewsbury Police Departments indicates that SULTAN phone #1 was in same general vicinity of the city of Hayward, California where SULTAN phone #1 was determined to be at the time SULTAN called the South Yarmouth Barracks of the MSP on February 7, 2015. In addition, the voice of the individual who called the Brockton, Rehoboth and Shrewsbury Police Departments sounded the same during each call and the description of his voice is consistent with that furnished by the Sergeant from the MSP. The caller in all cases appears to be the same individual; a male who speaks with a stuttered accent. Next, at the outset of each of the calls to the Brockton, Rehoboth and

3

Shrewsbury Police Departments, the unidentified individual immediately and specifically requests to speak to a "female officer or sergeant" just as he did when he called the South Yarmouth Barracks of the MSP.

The subject matter of the calls placed to the Brockton, Rehoboth and Shrewsbury Police Departments is nearly identical and consistent with the calls placed to the South Yarmouth Barracks of the MSP, with exception of the fact that the caller did not threaten to kill the call takers. The unidentified caller alleges that he escaped from a mental hospital where he spent several years. He alleges that he has hurt several people and that he has a gun or multiple guns. He promises not to hurt anyone if the dispatcher or officer listens to him and answers his questions. He promises to give the operator or officer all of his information and surrender one or more of his guns at the conclusion of the call if she listens to him. He asks a series of bizarre questions about whether or not the dispatcher or officer has ever seen a woman driving a garbage truck, dump truck, or a horse trailer and questions about the dispatcher or officer's "slippers." During the calls to the Brockton, Rehoboth and Shrewsbury Police Departments, the caller fails to provide, when asked, sufficient information to allow investigators to positively identify him or the precise location from which he is calling.

Since learning of the earlier described telephone calls placed by SULTAN to representatives from the MSP, Brockton, Rehoboth and Shrewsbury Police Departments in February of 2015, I have become aware of dozens of additional harassing telephone calls placed to other police departments in the U.S. at various times in 2015, which I also believe were placed by SULTAN.

### *February 2016 through August, 2016 calls placed by SULTAN using SULTAN phone #2, SULTAN phone #3, SULTAN phone #4, and SULTAN phone #5*

From February through August of 2016, representatives from various Canadian law enforcement agencies have contacted agents/officers from United States Immigration and Customs Enforcement ("HSI") and the FBI, to report receipt of dozens of recent harassing, obscene and threatening telephone calls placed to representatives from the reporting agencies which share many similar characteristics with the calls placed to by SULTAN to representatives from the MSP, and the Brockton, Rehoboth and Shrewsbury Police Departments in February of 2015. Many of the calls have been traced and determined to have originated from one of four different cellular telephones. Information pertaining to the phones is as follows:

1. MetroPCS cellular telephone assigned the number, 212-470-3740 (hereafter "SULTAN phone #2").

2. The MetroPCS cellular telephone assigned the number, 917-651-4594 (hereafter "SULTAN phone #3").

3. The MetroPCS cellular telephone assigned the number, 845 287-5495 (hereafter "SULTAN phone #4").

4. The MetroPCS cellular telephone assigned the number, 917 530-3398 (hereafter "SULTAN phone #5").

Of the aforementioned calls traced and determined to have originated from SULTAN phone #2, SULTAN phone #3, SULTAN phone #4, and SULTAN phone #5, all were routed over the internet using Voice Over Internet Protocol ("VOIP") technology via a call "spoofing" service.

According to publically available information and information on the spoofing service's website, AD HOC LABS, INC. is a company that owns a cellular "smart" phone application known as "Burner." For a small fee, users of the "Burner" application can create temporary "Burner" numbers which last anywhere from 14 to 30 days. After downloading the "Burner" application onto their phones, users can then use their "Burner" numbers to place and receive telephone calls and send and receive text messages over the internet directly from their cellular telephones. When a user places an outgoing call or sends a text message from his/her cellular telephone, the number assigned to their cellular telephone remains hidden from the call or text message recipient, while the temporary "Burner" number is passed through on the recipient's caller ID. In addition, telephone calls and text message placed and sent to the "Burner" number are routed over the internet to the user's cellular telephone. It should be noted that only one cellular telephone number may be associated with each "Burner" number (i.e. only one unique cellular telephone number can be associated with each individual "Burner" number).

While the subject matter of each call has not been exactly identical, during many of the calls reported to HSI and FBI personnel, the unidentified caller specifically requested to speak with a "female officer or sergeant." He claimed to have escaped from a mental hospital where he spent several years and threatened to harm himself and/or others if the call takers refused to answer his questions. He claimed to be in possession of weapons, including at times a handgun ("a .45 caliber") or handguns and/or an automatic rifle ("an AK-47"). He claimed to be placing the calls from within a hotel room which he had entered surreptitiously and without the knowledge of a female hostage whom he alleged that he had drugged and bound. He claimed to be beating the female hostage with a belt during the calls. During some of the calls, a woman can be heard screaming in the background.

These calls have resulted in extensive efforts by law enforcement officers in the United States and Canada to trace the calls and to identify the caller, the telephones from which he placed the calls, his immediate location (and that of the telephones he used to place the calls) at the time the calls were placed and the location and identity of his possible victim/hostage. In several instances, hostage negotiators and tactical police personnel have been activated and deployed in order to investigate the threatening calls and to conduct investigation at many different hotels located in Canada from which the caller alleged to have placed his calls. For several reasons, I believe that SULTAN is responsible for placing the aforementioned calls.

First, according to records furnished by representatives from MetroPCS/T-Mobile, both SULTAN phone #2 and SULTAN phone #3 bear the same account number, name and subscriber address. Accordingly, the two phones appear to be associated with a single, unique user.

Second, investigators obtained toll records and cellular telephone location information from MetroPCS/T-Mobile for SULTAN phone #3 from the time period from March 4, 2016 to March 9, 2016. At all times during the relevant period, the data indicates that

5

SULTAN phone #3 was located within the City of Hayward, California, in the same geographic area where SULTAN phone #1 was determined to be when SULTAN placed the earlier described calls to representatives from the MSP, and the Brockton, Rehoboth and Shrewsbury Police Departments in February of 2015.

Third, I have conducted an extensive review of audio recordings of recent harassing, obscene and threatening calls placed to the various Canadian Police Agencies over SULTAN phone #2, SULTAN phone #3, SULTAN phone #4, and SULTAN phone #5. For all calls that I have reviewed, the voice of the individual responsible for placing the calls sounds identical. Furthermore, for all calls that have been reviewed, the voice of the individual responsible for placing the calls sounds identical to SULTAN's voice when he placed the earlier described calls to representatives from the Brockton, Rehoboth and Shrewsbury Police Departments in February of 2015. Finally, the voice of the individual who placed the calls to the Canadian Police Agencies is consistent with the description furnished by the Sergeant from the MSP who spoke to SULTAN on February 7, 2015 in that voice appears to be that of a male who speaks with a stuttered accent.

### *Information regarding the identification of SULTAN and the location from which he is believed to have placed many, if not all, of his calls*

In an effort to identify SULTAN, investigators conducted extensive toll analysis on telephone records supplied by MetroPCS/T-Mobile for SULTAN phone #1. The analysis revealed that in addition to the hundreds of calls made to various police departments across the United States from February 3, 2015 through March 1, 2015, SULTAN phone #1 also was used to place and receive dozens of calls to/from a cellular telephone with a (510) area code during that same period. Many of these calls lasted for periods of significant duration, including at least 5 calls which lasted for longer than 10 minutes each. As a result of these contacts, I believe that SULTAN is a close associate of the user of that telephone number.

Investigators obtained subscriber and toll records from Sprint, which is the telephone company responsible for providing service to the (510) number. Those records reveal that the telephone is subscribed to by an individual who owns a residence in Hayward, California ("TARGET residence").

In March 2016, investigators requested that Hayward Police Department ("HPD") check their records to determine if the HPD maintained any information concerning individuals who may be residing at the TARGET residence. As a result of those checks, an officer from the HPD identified a male individual named SAMMY SULTAN who maintains an active California Driver's License with CDMV. On his license, SAMMY SULTAN lists the TARGET residence as his residence.

Further checks of the HPD in house computer system revealed that an officer of the HPD visited the TARGET residence on June 23, 2015, to conduct an investigation at that location. Just prior to the visit to the residence that day, officers from the HPD were contacted by a representative from the Lake County Sheriff's Department ("LCSD") in Lake County, Illinois. On that date, officers from the LCSD reported receiving a telephone call from an unidentified

6

male who sounded as if he might be mentally unstable. The unidentified male stated that he was in a hotel and "surrounded by guns." Officers from LCSD contacted representatives from MetroPCS, the telephone company responsible for providing service to the cellular telephone which the unidentified male used to call the LSCD that day, which revealed the cellular telephone was at a location in Hayward around the time LCSD received the threatening call.

Officers from the HPD visited the TARGET residence immediately following notification of the aforementioned call by representatives from the LSCD on June 23, 2015. Once at the residence, the investigating officers made contact with, and subsequently interviewed SAMMY SULTAN who was present at the residence. An audio recording of the officers' interaction with SAMMY SULTAN on June 23, 2105 was made using one of the investigating officer's body worn cameras (BWC's), consistent with HPD policy at that time. After arriving at the residence, the investigating officers were greeted by an elderly man who confirmed that he was SAMMY SULTAN's father and that he and SAMMY SULTAN were the only ones present at the residence. Thereafter, the officers made contact with SAMMY SULTAN.

After greeting SAMMY SULTAN and explaining only that the officers "got a call" and wanted to know if everything at the residence was "OK," SAMMY SULTAN immediately explained that this was "like the fifth time this crap happened." SAMMY SULTAN acknowledged that officers previously had been to his home on several prior occasions in order to investigate incidents involving, among other things, a "kidnapping" of someone who was being "held here at their will." When asked if he owned a cellular telephone, SAMMY SULTAN denied owning one. SAMMY SULTAN explained that his mother just had surgery and that he was taking care of her. Without prompting, SAMMY SULTAN stated that he got along with most of his neighbors, but he offered information concerning one particular neighbor whom he suspected could have been responsible for the investigating officers' visit to his residence that day. Thereafter, the investigating officers explained that the reason for their visit to the residence that day was the result of a "ping" from a phone indicating that there was a disturbance at his residence. The officers further explained that representatives from the HPD were contacted by officers from the LCSD in Illinois concerning a call that was placed to the LCSD that day. In response, SAMMY SULTAN expressed astonishment, claiming that there was no disturbance at the residence. He also denied knowing what a "ping" was and stated that the situation was "ridiculous."

I have reviewed an audio recording of the aforementioned call placed by the unidentified male to the LCSD on June 23, 2015, as well as the audio recording of the interview of SAMMY SULTAN by officers from the HPD that same day. I believe that SAMMY SULTAN's voice sounds identical to the voice of the individual who was responsible for placing the call to the LCSD, as well as the earlier described harassing, obscene and threatening calls to the various Canadian Police Agencies over SULTAN phone #2, SULTAN phone #3, SULTAN phone #4, and SULTAN phone #5 from February of 2016 through August of 2016 and the earlier described calls with SULTAN phone #1 to representatives from the Brockton, Rehoboth and Shrewsbury Police Departments in February of 2015.

7

***Call to the Royal Canadian Mounted Police ("RCMP") on April 30, 2016 and
subsequent interview of SAMMY SULTAN at the TARGET residence that day***

On April 30, 2016, officers from the HPD again visited the TARGET residence in order to
conduct further investigation at the location. Just prior to the visit to the residence that day,
representative from the RCMP contacted officers from the HPD to report the receipt of two
telephone calls which appeared to have been placed by a single, unidentified male who asked to
speak to a female. During the calls, the unidentified male caller claimed to have escaped from a
mental institution and made threats to harm a female whom he alleged to have drugged and
bound in a bathroom of a hotel from which he claimed to have placed the calls. While on the
telephone, screaming could be heard in the background. Before abruptly terminating the second
call, the unidentified male caller had engaged the call taker in a discussion involving a wide
range of bizarre topics which included questions about the call taker's feet and other topics
which were sexual in nature.

As a result of those calls, officers from RCMP wound up contacting representatives from AD
HOC LABS and MetroPCS/T-Mobile that day as part of their efforts to trace the calls and to
identify the caller, the telephones from which he placed the calls, his immediate location (and
that of the telephones he used to place the calls) at the time the calls were placed and the location
and identity of his possible victim/hostage. Through those contacts, officers from the RCMP
learned that the unidentified male caller had used SULTAN phone #3 to place the second call he
made to the RCMP that day.

As officers from the HPD arrived at the TARGET residence that day to investigate the calls, a
dispatcher from the HPD remained in contact with an RCMP officer who was involved in the
ongoing investigation of the calls. After arriving at the residence and announcing their presence
but before making contact with SULTAN (who later was located and interviewed inside the
residence), the unidentified male caller abruptly terminated his call to the effected Canadian law
enforcement office. Upon arrival at the TARGET residence, the investigating officers activated
their BWC's and knocked on the front door to the residence. They were greeted by SAMMY
SULTAN's father, and immediately requested to speak with SAMMY SULTAN.

Thereafter, the investigating officers interviewed SAMMY SULTAN and advised him that their
visit to the residence that day was a result of a request from officers from the "Mounties" or
Royal Canadian Mounted Police who alleged that SAMMY SULTAN had called them that day.
As during the previous visit to the residence on June 23, 2015, SULTAN acknowledged that this
was the fifth such visit by officers from the HPD to his residence while offering that he believed
one of his neighbors was responsible. He denied making the call and also denied owning a
cellular telephone or a functioning computer, while stating that he owned a broken computer
which was stored in his room inside the TARGET residence. SAMMY SULTAN told the
interviewing officers that he held no employment outside the TARGET residence, but that he
cared for his elderly father and mother and performed other chores at the TARGET residence on
a full time basis. SULTAN confirmed that he lived at the TARGET residence, maintained a
room inside the TARGET residence and frequently spent time in the garage of the TARGET
residence.

8

After leaving the residence, one of the interviewing officers went back to the HPD police station and listened to a recording of one of the calls placed by the unidentified male to the RCMP earlier that day. After listening to the recording, the interviewing officer opined that the voice of the unidentified caller to the RCMP matched that of SAMMY SULTAN.

Since the visit by officers of the HPD to the TARGET residence on April 30, 2016, I have obtained a partial audio recording of the second call placed by the unidentified male caller to the RCMP and the recordings made by the HPD during their interview of SAMMY SULTAN. Based upon my review, I believe that SAMMY SULTAN's voice sounds identical to the voice of the individual who was responsible for placing the second call to the RCMP. Furthermore, based upon the facts and circumstances of the interview and investigation by officers from the RCMP and HPD at the TARGET residence on April 30, 2016, I believe that SAMMY SULTAN was the person who was responsible for placing the calls to the RCMP on April 30, 2016 and that he did so while inside the TARGET residence.

### Search Warrant executed at 1104 Oakview Avenue

On the morning of August 25, 2016, agents and officers involved in this investigation executed a search warrant at the TARGET residence. SULTAN was located in the garage with his laptop computer and cell phone in front of him on a makeshift desk. Some of the items seized included a laptop computer and several cell phones.

A subsequent search of the laptop computer revealed internet search history which corresponded to some of the calls alleged to have been made by SULTAN. For example, on August 24, 2016, the Southern Idaho Regional Communications (SIRCOMM), who services calls for Jerome County Sheriff's Office, Jerome, Idaho, received a call from an unidentified male who gave the name of "Michael." During the call, he made similar claims and statements to other calls described in this affidavit. He wanted to speak to a female officer and asked questions about women operating heavy machinery, about the call takers shoes and feet, and about if the call taker would control him. He also claimed to have escaped from a metal hospital, to have questions in his head that have to be answered, and to have kidnapped a woman and have her tied up in her hotel room. Contact with representatives from AD HOC LABS and MetroPCS/T-Mobile determined the call originated from SULTAN phone #5. The voice of the individual who placed the call to the SIRCOMM on August 24, 2016, also sounds identical to the voice of SULTAN when he placed the other calls previously described in the affidavit. The search of the laptop seized from SULTAN showed in the internet search history that prior to the call, SULTAN had been conducting searches online about female dispatchers working graveyard shifts in Idaho, photos of female SIRCOMM dispatchers, and live audio feeds of police scanners in Jerome County.

### Information suggesting SULTAN has employed an audio recording of a female who appears to be screaming in distress during some of his calls

Based upon the facts and circumstances surrounding the previously described telephone call to the RCMP on April 30, 2016 and the search warrant executed on August 25, 2016, I believe that SULTAN has employed an audio recording of a female who appears to be screaming in distress during some of his calls. The first basis for my belief stems from the results of the investigation performed by officers of the HPD at the TARGET residence on April 30, 2016. On that date,

9

officers of the HPD arrived at the TARGET residence while the previously described call the RCMP remained in progress. Their investigation included a cursory search of the TARGET residence at which time they found no evidence of a female hostage therein. While their search did not represent a complete inspection of the TARGET residence in every area where a person could be hidden, no evidence was discovered which suggested a female hostage was being held against her will within the TARGET residence. The second basis for my belief stems from the results of the search of the laptop seized from SULTAN on August 25, 2016. Located in the files of SULTAN's computer was an audio recording of a female who appears to be screaming in distress. I have listened to this audio recording and believe it is either the same, or very similar to the female screaming in some of his calls. For these reasons, I believe a logical inference is that SULTAN has employed an audio recording of a female who appears to be screaming in distress during some of his calls.

### **CONCLUSION**

Based upon the foregoing, and based upon my knowledge, training and experience, I submit that there is probable cause to believe that SULTAN did knowingly and intentionally place telephone calls to various individuals in violation of the TARGET offenses.


Special Agent Mark R Dixon
Federal Bureau of Investigation

Sworn to me this 13th day of March, 2017


The Honorable
United States Magistrate Judge

10